Last case is Minnis v. Board of Supervisors of Louisiana State University. Ms. Craft? Thank you, Your Honors. Good afternoon. I'm Jill Craft on behalf of Anthony Minnis. And we are here in a position which I'm not exactly certain, based on the record before you, how summary judgment was granted. In this particular case, Tony Minnis had served at LSU for 21 years, 18 years as head coach of women's tennis, and frankly, as the record evidence shows, the only African-American head coach that LSU ever had until recent history. He certainly, at the time of his hire and throughout the majority of his tenure at LSU, was the only African-American head tennis coach, women's tennis coach, in all of the SEC. When we get into this particular case, we find, as did Mr. Minnis when he was a college member in 2008, who questioned why his salary was so different in comparison to all the other LSU head coaches of the minor sports, minor sports being defined as not obviously LSU football, LSU baseball, LSU softball, or LSU men's and women's basketball, but all the other sports. That's how we started. Her name was Dottie Reese, and when she questioned both the pay disparity and discussed it with Mr. Minnis, she was then told by LSU, as was Mr. Minnis, well, you're fifth within the SEC. As the record evidence shows, that is a false reason. Mr. Minnis, over the ensuing years, began questioning his pay on comparison to all other head coaches. The record evidence shows that Mr. Minnis, at the time of his appointment as head coach, made $110,000 a year. When Mr. Minnis was terminated in May of . . . And you mean the next lowest paid women's head tennis coach. Is that what you mean? The next lowest paid head coach in a minor sport, which was, I believe, men's golf. So that's the LSU comparison. I'm sorry? That's the comparison of pay at LSU you're talking about. Yes, sir. Directly within LSU. And what was that sport? That was, I believe, Your Honor, men's golf, if I'm not mistaken. And I think that was the pay disparity attributed to Chuck Winstead. I may be inaccurate, but I did put the table together for you because it's very striking. Here we go. In the pay disparity, and of course we had some raises in 2008, of which Mr. Minnis received $3,000. The next lowest raise was $5,000. That was for the men's head tennis coach. Women's soccer, volleyball, women's golf got a $3,600 raise. When you look at the pay scale for LSU in comparison to Mr. Minnis, not only was he woefully underpaid to the tune of $25,000 to the next sport, but he was paid almost $40,000 less than the men's head tennis coach. When I questioned the athletic director, Joe Oliva, about why is the pay disparity between men's and women's tennis coach so great, his answer, as we cited in our brief and what he said in his deposition was, well, in my opinion, men's tennis is a more rigorous sport. It's more physically demanding and the players are better. There's a greater pool of talent in men's tennis than there is in women's tennis. When I asked him, are there more men's tennis teams in the NCAA, you know, brackets throughout the country than there are women's, he said, no, there are far more women's tennis teams throughout the country than men's. The natural question— Counselor, the clock's ticking. Yes, sir. I read this exchange— Yes, sir. —where he gave those responses. If you could, though, connect that to this claim for me— Sure. —kind of quickly. Sure. In two ways. Number one, I think the genesis of the pay disparity, when questioned, we have been given shifting reasons throughout as to why Mr. Menace was 85 and the men's head tennis coach, Judge Weiner, was Andrew Den. He was the next pay. Why was he paid in such a disparate fashion? And we were given a multitude of reasons, the first being, well, that we compared him to head women's tennis coaches in the SEC West. I have those numbers for you. His replacement, Julia Sell, was paid $120,000 a year when she started at LSU, plus she got TV money and some other incentive bonuses, with little or no experience. The justification given by LSU in that instance was, well, she was given a job offer at Clemson, which by the way is not in the SEC West. So on the one hand, you have LSU saying we're justifying it because we're comparing his salary to all women's head tennis coaches in the SEC West. Then the market value suddenly, when they hire Ms. Sell, a white female, is structured upon something fundamentally different. She had an outstanding job offer from a non-SEC West team, so that's why we paid her more. Even if you look at the reasons for termination given to Mr. Menace, both to him directly— Was his salary comparable to other women's head tennis coaches in the SEC? In the SEC West, which is what they said, and the answer to that is no, sir. When we looked at those numbers, which are also outlined in my brief, the only one who was paid less money was $79,800 and some odd at Mississippi State University, who was a brand new hire with absolutely no experience. There was an $85,000 pay scale at Auburn, again, a brand new hire with absolutely no experience. Tony had $85,000. In comparison to all his colleagues in the SEC West, not only did he have the longest tenure, but he had the most successful tenure overall, having been nominated for National Coach of the Year. If you followed LSU's logic on the salary disparity, and it's a comparator made in the SEC West, should have at the most been paid $79,000 or perhaps $85,000, if it's a comparison in the SEC West for a brand new hire. You're leaving out the fact that South Carolina is trying to hire her. Sorry, South Carolina, yes, sir. And I said Clemson. I misspoke. But South Carolina is also not in the SEC West. Well, does that matter? They're still trying to hire her. Well, yes, sir, they're trying to hire her. But if you're going to tell a reason to the extent that you're being paid more money, yet at the same time when you're trying to justify Mr. Minnis' woefully inadequate salary for 18 years, then the reason should not change or differ, which is exactly why the Supreme Court in Reeves talks about this shifting reason maxim. It talks about if the employer offers a reason and changes its reason over time, as the Seventh to make the decision and may freely infer that the employer is dissembling to cover up an unlawful discriminatory or retaliatory reason. And that's what we have here. What's good for the goose is good for the gander, meaning that if we are going to set salaries as a matter of policy at LSU based on one criteria, which is SEC West, that's what they said, then when you hire somebody new, a white replacement with no experience, absolutely no national search, no job posting of any kind, out of the blue, and pay her that much more, particularly when you have an African-American employee who has been complaining about that for a number of years, and he himself given shifting reasons for the disparity in pay over time. In addition, when he was terminated in terms of the retaliation claim, he had not only to be Title IX in equities and women's tennis, starting as far back as 2008, but in January of 2009, he directly inquired of Miriam Seager, who was one of the associate athletic directors, I want to know what my salary is and I want the comparison. At the same time, the Office of Federal Compliance was on campus and interviewing him, to whom he also reported not only the pay disparity, but also the disparity from a Title IX perspective. On 3-28-2012, he submitted his written complaint to a leave of the last paragraph of which talks about the fact he believes he's being retaliated against, that the running of the women's tennis program violates Title IX, and that his rights have been violated. That's March 28, 2012. He is terminated on May 16, 2012, after returning from a successful run in the NCAA tournament. And after he's fired, he is given a bonus from LSU for athletic excellence. As I pointed out in the brief, if you look back at the history of his evaluations on a consistent basis, side-by-side comparison with the comparators who were evaluated as job title head coach on the identical criteria throughout, Tony Minnis received needs improvements when he finished 24th in the country. Jeff Brown received excellent, or I'm sorry, very good when he was ranked 28th in the country. In the EEOC filings, LSU would later claim that my client was actually terminated not to go in a different direction or merely we didn't like him, we wanted to replace him, but because he had some sort of NCAA violations. As the Court is aware, the record evidence establishes that Tony, at the most, had two minor NCAA violations throughout his entire career. One was the purchase of motivational books, and the other was a $14 meal advance. In 18 years as head coach, 21 as a coach. Whereas on comparison, almost every other comparator coach had at least two, if not three, four, or five on an annual basis. Consistently, Tony Minnis would receive needs improvement in that identical category for a minor violation. Whereas the other coaches with three, four, five, and in one case, seven, received excellent in the identical category. The disparity in terms of the treatment, the pay, and in terms of the discriminatory behavior continued throughout the entirety of his employment. In rejecting the harassment claim, for example, the District Court said, I'm only going to look at any incidents occurring within the 300 days immediately preceding the filing of the EEOC charge. In that vein, the District Court rejected consideration of all other pieces of evidence forming part of the pattern and practice of harassment leading up to his termination on May 16th, which, as we've pointed out to the Court, was erroneous. Similarly was his decision, post Ledbetter and the amendments to Title VII, to say, I'm not going to look at what happened in 08, 09, and 10 in terms of the evaluations, which if you believe LSU's reasoning for why he was terminated, or one of the reasons why he was terminated, i.e., poor performance, the District Court said, I'm not going to look back at those incidents in terms of disparate pay going forward. All I'm going to do is look at his pay in 11 and 12, and I don't see anything that leads to disparate pay. As this Court is aware, post the last Ledbetter amendment, there is a distinction. In the statute itself, and the language construct itself, it defines discriminatory pay as not when the incident occurred that triggered the discriminatory pay, but it speaks in terms of every time you get a paycheck that remains as a vestige of those prior acts. That in and of itself triggers relief anew. Ledbetter itself, reversed legislatively, involved a situation where a woman was woefully underpaid for a period of approximately 18 or 20 years. Didn't know it. There was a decision made way back in the past which affected her pay prospectively. That's the backdrop against which Congress enacted the Ledbetter amendments to Title VII. In addition, Your Honor. Let me ask, how did that affect this? Judge Jackson considered the pay that your client got during the time period before 2012. I can quite understand from his opinion when the pay started that he said he would consider. So that pay had the kind of discriminatory effect, in your view, in 2011-12. What would he have considered, under your understanding of how Ledbetter would work, prior to 2011? Are you talking about the acts of discrimination prior to that, which might have weighed on 2011-12? Well, there were several pieces of evidence in the record, not the least of which was the last time raises were given to the head coaches at LSU of the minor sports was in 2008. The record evidence shows that at that time, Mr. Minnis was given a $3,000 raise, and as I said earlier, the next lowest was $3,600, I think, to golf, women's golf. There were also raises given at the same time to Jeff Brown, the head men's tennis coach, of $10,000 on an annual basis, and a couple other tens and a few fives. In that year in particular, Tony Minnis and his team was ranked, I believe, it was 24th in the country. Jeff Brown's team was ranked 28th. In terms of these other coaches that you're using as comparators, are these, and I may have missed the mention of it, but are any of these minor sports revenue-generating sports? No. Men's golf? None of them are. No. Women's golf? I mean, you know, men's tennis would be identical probably to women's tennis, volleyball, gymnastics, women's soccer. These are the sports to which we're making the comparisons. As Pyrrhic . . . None of which are revenue-generating, according to you. As far as I know, that's right. All right. Yes, sir. That's why I excluded the big money sports, because I understand that, as the Seventh Circuit did in Pyrrhic involving IUPUI. They're kind of in that sense apples and oranges, the minor sports are not. And furthermore, on these justifications repeatedly given, when I asked Mark Ewing, who's the CFO for LSU's Athletic Department, well, on what basis are you making the salary decisions for the minor sports, and he said, well, we really can't. And you can't compare them to the other schools, because it's like apples and oranges. Thank you. All right, counsel. Good morning, Your Honors. I'm Vicki Croce. I represent the Board of Supervisors of Louisiana State University, or LSU. I'm going to talk with you, if I can, briefly about the facts, and then I want to focus on the pay and the hostile environment argument that Ms. Craft made. Let me say this, there are no shifting reasons for the decision to terminate Mr. Minnis. LSU has been consistent in its reasons. Its reasons were his poor competitive record. Coaching is a game of, what have you done for me lately? If you do not win, you are not successful. Mr. Minnis had 21 years to try to put a quality program together, and he did not. I'll briefly remind you of the facts. I know you've read the submissions. Well, the record through the years has varied, and one of the interesting pieces of evidence is it seems to be agreed that the men and women's teams did exactly the same over the last five years. I don't know if it was exactly the same, but they had very similar records. Well, we don't have to go with exact, but something that would not be a distinction between keeping one and running one off, if you're just looking at records over the last five years, it seems to be accepted. And he was fired at the end of that five years. So why? I mean, that does seem to be inconsistent with saying he was unsuccessful if over the last five years he was successful as the other coach. Well, there are not just the five-year review that LSU is considering when it's looking at Mr. Minnis. And I would say that we don't concede that Coach Brown, the men's tennis coach, is a proper comparator. Athletics is unique. Athletics involves comparing coaches in one sport to other coaches with whom they compete in the same sport. And unlike what Ms. Craft says, Mr. Minnis was compared for salary and for performance to other women's tennis coaches, not in the SEC West, but in the SEC. That's the proper comparator. But even if we accept that Coach Brown of the men's tennis team might be a proper comparator, his record over the course of his career at LSU is much better than Mr. Minnis's was. His salary was also different because he was hired at a later time than Mr. Minnis was, where the market was different, and he also had had an offer from another university that LSU had to meet at some point during his career. So we disagree that he's a proper comparator, but even if he is, he's not identical, as the case law requires, to Mr. Minnis. Here's Mr. Minnis's history at LSU. His highest ranking ever was 18th in 1995. 18th in what? National ranking. Okay. He only had four winning seasons in his final 11 years. He didn't go to the tournament, the NCAA tournament, in 2006, 2011, 2012. He only had three winning seasons in the SEC during his entire tenure. He had a losing record in the SEC, 81-146. And he had three losing seasons immediately prior to the time LSU decided not to renew his contract in 2012. We disagree strenuously that Mr. Minnis should be compared to other LSU coaches in other sports. That is the apples and oranges comparison, but even if you look at that comparison, of all LSU varsity sports, Mr. Minnis's record was the poorest average finish and the lowest winning percentage in the SEC of all LSU sports during the time he was at LSU. Mr. Minnis wants to complain about his salary and what was considered in connection with his salary, but he's really put no evidence in the record of how he compared to other coaches in the SEC. Ms. Craft cited you some numbers, but those numbers are not in the record. The only time we have any information about how he compared to other coaches in the SEC was in 2008. Yes, his replacement was paid at a higher rate when she was hired, but at the same time, LSU had to compete with what? Another SEC school. South Carolina is another SEC school, and Ms. Sell had an offer from that school. It also had to compete with other good coaches in the SEC and what the market would bear at the time. It didn't want to bring in a coach who was going to perform the way Mr. Minnis was performing. It needed a coach that was going to improve the program, a coach that was hired, by the way, with more experience than Mr. Minnis had when he was hired by LSU. We disagree that the district court should have considered more than it did when it looked at Mr. Minnis' pay claim, because even post-Ledbetter, the court can only consider, can only grant two years of back pay if there's been a finding of discriminatory pay, and can only consider what would otherwise be untimely acts if they are related to what would be timely acts of discrimination. In other words, acts that had happened within 300 days of the filing of the EEOC charge. And there aren't any? They have to be related to each other, and they're not. There was no evaluation of Mr. Minnis after 2011. His last evaluation was in 2009. There are no comparable acts after 2011 to acts that occurred in pre-2011 time frame. The one that opposing counsel identified to my question was 2008 was the last across the board, maybe, raises, I don't know, the last raises that some of these coaches received. And my sense of what she was arguing is that if you looked at the 2008 raise, which she argues the Ledbetter Act would allow you to do, you would see discriminatory action in the level of the raises, which Judge Jackson did not look at because of his view of the limitation period. What's your response? Do you agree that he did not look at the 2008 raise equation and decide if there's anything discriminatory about it? In a sense, I agree that he did not look at it. But the only evidence of any salary compensation comparison for Mr. Minnis was in that 2008 time frame. And even had he looked at it, there would have been no evidence to support that Mr. Minnis' raise had anything whatsoever to do with how his salary was fixed. Even Mr. Minnis testified, I don't know how my salary was established. But LSU testified, it's established based on how you rank and how you compare to other SEC coaches. And contrary to what Ms. Craft has argued, his salary was commensurate in 2008, as was his increase with how he compared to other coaches and their finishes in the SEC. I think even had the Court considered the 2008 or any other pre-2011 pay treatment, the conclusion would have been the same because there was, one, no evidence of pay treatment other than 2008. And though the plaintiff relies on evaluations that he contends affected his pay, there's no evidence that that's, in fact, the case. There's no evidence that evaluations were pay decisions as described in the Gentry case and as limited by this Court in later decision. Does the evidence show that he has made the same amount of money since the 2008 raise each year? Was that the — so his salary was set at $85,000 in 2008? No, Your Honor. He had some increases. He had some increases. There's no evidence about anybody else and their increases other than the salary of Mr. Brown, which there were other legitimate, nondiscriminatory reasons for the distinction between the two of them. Let me move to the hostile environment claim, and let's talk about what Mr. Minnis actually — what evidence he has of how he was treated. His evidence was he had a reprimand in 2008. He had a reprimand in 2012. He was unhappy with how he was evaluated. Those are distinct, discrete acts. They are not severe and pervasive conduct that poisoned his employment environment, as has to be the case in order to succeed on the hostile environment claim. We submit that the trial court was correct in limiting which acts it considered when looking at the hostile environment claim because they were discrete acts, and Mr. Minnis was untimely on some of the acts on which he based his claim. But even had the court considered all of the actions that Mr. Minnis says he was subjected to, they're not enough. A reprimand is not an adverse employment action. It's a discrete act, but even if it's part of a continuing pattern, as Mr. Minnis would like to have this court believe, it's not an adverse employment action, nor is an evaluation. And let me speak for a minute about the evaluations. LSU has submitted evidence and argued in its brief what is, in fact, the case. Some years, Mr. Minnis was evaluated as needs improvement or unsatisfactory with a ranking of a certain level, and another coach was evaluated as satisfactory with a lower ranking. And some years, it was vice versa. So those evaluations were inconsistent as it relates to all of the coaches for whom evaluations are in the record. Mr. Minnis wasn't treated any differently than anyone else. There were years when he was rated better than a coach who had a better competitive record than he did, and that's evidence that is in the record and has been analyzed for the court. So there's no evidence that he was singled out because of his race in the way that he was evaluated or that he was retaliated against or singled out because he had made complaints or allegedly made complaints in connection with his evaluations. Let me move briefly to the retaliation claim because Mr. Minnis argues in his brief that the improper standard was applied to the Title IX retaliation claim. On the Title VII retaliation claim, we contend that Mr. Minnis never engaged in any protected activity. I don't know where this idea that the Office of Federal Compliance was on campus and Mr. Minnis spoke to them. There's no evidence of that in the record. There is evidence that in 2008, he told some administrators that he thought that his then supervisor was a racist, and when asked why he thought so, he couldn't give any reason. That's the only mention of race about which Mr. Minnis testified in his deposition and which is in the evidence. That's the only mention. He did not have a continuing practice of complaining about or saying that he had been discriminated because of his race, so no protected activity. But even if that comment about his supervisor being racist could be protected activity in 2008, certainly it's not connected to the decision to terminate him in 2012, a decision made by others other than the supervisor that he thought was racist. That supervisor had retired two years before he was terminated. On Title IX, we strongly disagree with Ms. Craft's contention that the memo sent to Mr. Oliva in March of 2012 said anything about a violation of Title IX. Mr. Minnis never mentioned Title IX to anyone, and there's no evidence that he did. There is evidence that he complained about the facility that he had to use, the same facility that the men's tennis team used. The coach of the men's tennis team had the exact same complaints about the inadequacy of the facility and the issues with practice when there was bad weather. In that context, that certainly wasn't a Title IX complaint. At least we contend it wasn't. Certainly not enough to put anyone on notice that because the men and the women had an opportunity, that is, the same facility, that there was a Title IX issue being asserted by Mr. Minnis. We also submit that the district court used the correct standard in evaluating the Title IX retaliation claim, the standard, the but-for standard that's been established for Title VII and the ADEA. In fact, this court, when considering whether or not there was even a claim for retaliation under Title IX, looked at the regulations, the implementing regulations, saw that the regulations did define a retaliation claim, used that because language, because of protected activity that's found in Title VII and under the ADEA, and said that the two were essentially identical and, therefore, finding a retaliation claim existed. We submit that it's a logical extension of that decision to conclude that the but-for standard is the proper standard for a Title IX retaliation claim, and there's simply no evidence that, one, that Mr. Minnis ever made a complaint under Title IX or, two, that he was terminated or treated adversely because he had made a complaint. He cannot bear that strong burden, that but-for burden. We submit that LSU has been consistent in its reasons for its decision related to Mr. Minnis. He didn't win. He had some other issues that also played a role, but he didn't win. Coaching is a harsh game, and it's a very much a what-have-you-done-for-me-lately profession, and, unfortunately, over the course of time, he wasn't competitive. All right. I'll answer any questions you have. Thank you. Thank you. Ms. Crathers? Very briefly, Your Honors, if you follow their argument to the end, logically, he, quote, didn't win, then how do you explain that my client was terminated less than a handful of days after returning from the NCAA tournament and, after his termination, receiving a bonus from LSU for what they define as athletic excellence? It's because of these questions of fact that summary judgment should never have been granted in the first instance. Judge Winters, you wrote in the McMullen opinion very recently, a few months ago, last month, basically, when you look at the situation in that case of female lieutenants seeking promotion to the director position, when you look at what's going on, and that was a race case as well, there was, in that case, no direct evidence that I'm aware of from the record of racism, but you had a white applicant for promotion, two African-American applicants for promotion, and the court clearly analyzed, as it should in this instance, what are the circumstances surrounding what have they done? Additionally, one of the issues that I strongly disagree with is that of the Title IX evaluation standard. The reason the Nassar court established this standard, but for causation in Title VII, is textual, completely in origin. In 42 U.S.C. 2000E3, which is the opposition clause to Title VII, in Title VII, it specifically defines, thou shalt not essentially take retaliatory action because of, on account of. Keying off of the statutory language, that's why Nassar said the but-for causation is substantially a motivating factor. There is no such textual language in either Title IX, or frankly, in Louisiana's anti-reprisal statute, LARS 23967, and in fact, the textual language from 23967 is merely a motivating factor, that an action was taken because of a. So the district court, in grafting on the Nassar standard, where you have statutory words that say what they say, to Title IX, where you don't, and 23967, where you clearly don't, if anything, you've got a motivating factor for reprisal, as the standard was erroneous. Again, in this case, Your Honor, in terms of the evidence of the record, I think there is the testimony from my client, and it is frankly not appropriate on summary judgment to disregard what Tony Minnis said. Every time I approached Eddie Nunes about my complaints, he told me we were pissing off the administration. I was making them mad. He also testified that on a number of occasions, when he approached Nunes about concerns that he had specifically, that Nunes' response, starting in 2008 and going forward, was, if you don't like it, you can get another job. And those sentiments, according to Tony Minnis, were echoed throughout his employment, leading up to his termination, upon his return from the term. So for these reasons, Your Honor, we ask that you reverse the grant of summary judgment in this case, and let a jury decide it. There are clear credibility questions, not the least of which is the credibility of the I didn't mean that. Yeah, I did mean that. All of those are what the Supreme Court bespeaks in Reeves, shifting reasons, dissembling to cover up a discriminatory and illegal motivation. Thank you. All right, Counsel. That's the final case for this morning.